# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**PERRY SPENCER,**                     )
                                       )
    **Plaintiff,**   )
                                       )    **Civil Action No.**
    **v.**            )    **17-11229-FDS**
                                       )
**MASSACHUSETTS BAY**                  )
**TRANSPORTATION AUTHORITY,**          )
                                       )
    **Defendant.**    )
_____)

## MEMORANDUM AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a case of alleged employment discrimination based on race and retaliation for

engaging in protected activity. Plaintiff Perry Spencer, an African-American man, works as a

streetcar motorperson for defendant Massachusetts Bay Transportation Authority ("MBTA").

Spencer has a lengthy history of suspensions and discipline for safety and drug violations.

He was terminated from his position in 2006 for a safety violation. He then brought claims of

race discrimination before the Massachusetts Commission Against Discrimination ("MCAD").

He was reinstated in 2008 after an arbitration proceeding. Ultimately, the parties settled the

MCAD proceeding.

Spencer alleges that upon his return to work, the MBTA took various adverse

employment actions against him. Specifically, he alleges that he was subjected to discrimination

and retaliation when the MBTA deprived him of overtime opportunities in 2010 and 2011,

denied him an opportunity for a promotion in 2011, and subjected him to disparate discipline for

safety violations in 2011 and 2016.

Spencer asserts claims for discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and also seeks recovery for negligent infliction of emotional distress under Massachusetts common law.

The MBTA has moved for summary judgment on all counts. For the reasons stated below, the motion will be granted.

## I.  Background

### A.  Factual Background

The following facts are as set forth in the record and are undisputed except as noted.[1]

Perry Spencer is an African-American man. (Spencer Aff. ¶ 1). He was hired as a "streetcar motorperson" by the MBTA in 2000. (*Id.* ¶ 3; Spencer Dep. at 6-7, 22).[2] He is responsible for driving trains on the MBTA Green Line in Boston, Brookline, Cambridge, and Newton. (Spencer Aff. ¶ 2; Spencer Dep. at 7; Thibodeaux Aff. ¶ 8).

#### 1.  2006 MCAD Charge and 2008 Reinstatement

On May 15, 2006, Spencer was found to be operating his train with the left-side doors open. (Thibodeaux Aff. ¶ 10). As a result, on May 25, 2006, he was suspended for 30 days. (*Id.*). That suspension included a recommendation for discharge. (*Id.*).

Prior to his May 2006 suspension, Spencer had been disciplined for driving a two-car train without a second operator. (*Id.* ¶ 11). He also failed a subsequent drug test. (*Id.*). The MBTA and the union reached a settlement agreement concerning the conditions under which he

---

[1] Because the factual record concerning Spencer's employment history with the MBTA is extensive, facts not relevant to the remaining disputed claims have been omitted for the sake of brevity.

[2] At all times, Spencer's employment with the MBTA has been governed by a collective bargaining agreement. (Thibodeaux Aff. ¶ 9). He has also been subject to public-safety rules and regulations, including the MBTA's progressive-discipline policies governing safety violations. (*Id.* ¶ 8).

could remain employed. (*Id.*). That agreement provided that any further violation by Spencer of any MBTA rule or regulation would result in his discharge. (*Id.* ¶ 12). Accordingly, on August 16, 2006, he was terminated as a result of his May 2006 suspension. (*Id.* ¶ 13).

On December 26, 2006, Spencer filed a charge with the MCAD alleging that his termination, as well as certain scheduling assignments by an MBTA inspector, were discriminatory. (Cook Aff. Ex. 1; Spencer Aff. ¶¶ 8-9, Exs. 1-2). He also pursued a union grievance. (Spencer Aff. ¶ 10, Ex. 3; Thibodeaux Aff. ¶ 14). On September 15, 2008, he was reinstated following a labor arbitration proceeding. (*Id.*).[3]

### 2. October 2010 Suspension

On October 6, 2010, Spencer received a one-day suspension for violating the MBTA's attendance policy. (Def. Ex. D at Response #7; O'Brien Aff. ¶ 4, Exs. 1-2). As a result of that suspension, and in accordance with MBTA policy, he was ineligible to apply for any substitute-coverage positions—essentially, promotional opportunities—for a period of one year after his date of suspension. (Cook Aff. Ex. 5 at 5; O'Brien Aff. ¶¶ 8-9, Ex. 4). Nonetheless, in March or April 2011, he attempted to apply for a substitute-coverage position as a yardmaster. (Cook Aff. Exs. 4-5, 9; Spencer Dep. at 129). He was deemed ineligible due to his October 2010 suspension. (*Id.*).

### 3. December 2010 Overtime Bypass

On December 28, 2010, Spencer was bypassed for an overtime assignment in favor of a white, less senior, employee. (Spencer Aff. ¶¶ 14-15). He alleges that Paul Belanger, a white MBTA inspector, told him there was no overtime available that day. (*Id.* ¶ 14). In fact, overtime

---

[3] On October 22, 2010, the MCAD made a finding of probable cause in the 2006 discrimination proceeding. (Cook Aff. Ex. 2; Spencer Aff. ¶ 12). On January 20, 2011, Spencer settled that matter with the MBTA. (Spencer Dep. at 37).

had been assigned to a white employee with less seniority.  (*Id.* ¶ 15).[4]

That same day, Spencer submitted an internal complaint that he was not offered the overtime assignment.  (Cook Aff. Ex. 10).  The MBTA supervisor on duty, Margaret Fong, an Asian-American woman, reviewed his complaint and acknowledged the mistake.  (Fong Aff. ¶¶ 1, 4-7; Cook Reply Aff. Ex. A).  Specifically, she acknowledged in an e-mail to other MBTA personnel that it was "[her] mistake for not double checking the hiring procedure."  (Fong Aff. ¶ 7; Cook Reply Aff. Ex. A).  She requested that a notation be placed in Spencer's personnel file, and reinstructed Michelle McHugo, the yardmaster, on the proper procedure for assigning overtime.  (Fong Aff. ¶¶ 6-7; Cook Reply Aff. Ex. A).[5]

On January 10, 2011, Spencer filed a complaint with the MBTA's Office of Diversity and Civil Rights ("ODCR"), alleging that the overtime bypass was retaliatory and discriminatory. (Cook Aff. Ex. 11; Spencer Aff. ¶ 23, Ex. 6).  He specifically alleged that "management of the green line are upset that I got my job back and the MCAD ruled in my favor."  (Cook Aff. Ex. 11).

### 4.    June 2011 Overtime Bypass

On June 18, 2011, Spencer and Belanger were involved in another overtime bypass incident.  On that date, Belanger assigned Spencer an 8:00 a.m. to 7:15 p.m. overtime shift. (Spencer Dep. at 81-83; Thibodeaux Aff. ¶ 25).  The MBTA contends that Spencer completed the overtime assignment, and was released at the end of his shift at 7:15 p.m. (Thibodeaux Aff. ¶

---

[4] The MBTA contends that it was actually Michelle McHugo, a white MBTA yardmaster, who assigned the overtime shift to the less-senior employee.  (Fong Aff. ¶ 5).  Spencer maintains that it was Belanger who initiated the overtime bypass.  (Spencer Aff. ¶¶ 14-20).  He alleges that when he asked Belanger why he was bypassed, he responded that it was McHugo's decision, but when he asked McHugo, she responded that it was Belanger's decision.  (*Id.* ¶¶ 16-18).

[5] Spencer contends that he did not learn of Fong's response until the MBTA filed its Statement of Undisputed Material Facts in this proceeding.  (Spencer Aff. ¶¶ 26-28).

26).  He disputes this, contending he was "knocked off the clock" by Belanger before 7:15 p.m., while a less-senior employee, an African-American woman, was permitted to continue working overtime.  (Spencer Aff. ¶ 29; Spencer Dep. at 81-83).  He alleges that this constituted an overtime bypass because he was not allowed to work the same amount of overtime as the less-senior employee.  (*Id.*).  Belanger testified that at the time of the June 18, 2011 incident, he was not aware that Spencer had filed a complaint with the MCAD or ODCR, or even that Spencer had ever complained to anyone at the MBTA that Belanger subjected him to discrimination.  (Belanger Dep. at 20-21, 80).

On June 24, 2011, Spencer filed a second MCAD charge, this time alleging that the MBTA retaliated against him for "settling" his 2006 MCAD case in 2010.  (Cook Aff. Ex. 3).[6] Specifically, he alleged that the MBTA retaliated against him by denying him overtime on three occasions, by not allowing him to apply for the substitute yardmaster position, and by treating three medical absences as unexcused.  (*Id.*).[7]

### 5.    September 2011 Speeding Suspension

On September 13, 2011, Spencer received a three-day suspension for speeding.  (O'Brien Aff. ¶¶ 10, 14, Exs. 5-6, 8-9).  On that day, a random speeding audit found that he was driving 16 miles per hour on a section of track where the speed limit was 10 miles per hour.  (*Id.* ¶¶ 10-11, Exs. 5-6; Spencer Aff. ¶ 39, Ex. 8; Spencer Dep. at 110).[8]  The same audit found that two other operators, a white man and an African-American woman, were also speeding, at 15 and 14 miles

---

[6] Spencer apparently understood the MCAD's 2010 probable-cause finding to mean that the MCAD had made a finding of discrimination.  (Spencer Aff. ¶¶ 12-13; Spencer Dep. at 37, 51-53, 60).

[7] The only alleged adverse employment actions that remain at issue are the denial of eligibility for substitute-coverage positions; the two overtime bypasses; and, as discussed below, suspensions he received for speeding and a split-switch accident.

[8] Spencer denies that he was speeding, and objects to the MBTA's proof of the offense.  (Spencer Aff. ¶¶ 39, 41-42, Ex. 8).

per hour, respectively.  (O'Brien Aff. ¶ 12, Ex. 5; Spencer Aff. ¶ 40, Ex. 8; Spencer Dep. at 110).

Speeding of any kind is a violation of MBTA's safety rules.  (O'Brien Aff. ¶ 13, Ex. 7).

However, under the MBTA progressive-discipline policy, only an operator found to be speeding

more than five miles per hour over the applicable limit may receive a three-day suspension.  (*Id.*

¶¶ 14-15, Exs. 6, 8-9).  Accordingly, Spencer received a three-day suspension for speeding, but

the other two employees did not.  (*Id.*).

On November 16, 2011, Spencer filed a rebuttal statement in his 2011 MCAD

proceeding, alleging additional retaliatory or discriminatory actions by the MBTA, including the

denial of overtime on five occasions in 2010 and 2011, and the three-day suspension for

speeding.  (Cook Aff. Ex. 4).[9]

On May 30, 2014, the MCAD issued a finding of lack of probable cause in the 2011

proceeding.  (*Id.* Ex. 5).[10]

### 6.    January 2016 Split-Switch Accident

On January 15, 2016, Spencer and another MBTA employee, Scott Collins, were working

at the Reservoir yard on the Green Line.  (Def. Ex. D at Responses #3, 5; Spencer Dep. at 117).

Collins is a white man.  (*Id.*).

Spencer and Collins were instructed to bring a two-car train with an air-pressure problem

to the report rail.  (*Id.*).  After determining which of the two cars was disabled, they separated the

cars.  (Collins Dep. at 11-12, 15; Spencer Dep. at 117).  Collins then attempted to drive the

disabled car to the car house for repairs.  (*Id.*).  In doing so, he approached and then crossed

---

[9] Spencer also alleged additional acts of discrimination and retaliation arising out of drug and alcohol testing that he was required to undergo following a January 25, 2011 accident involving a customer who fell onto the track while his train was in service.  (Spencer Aff. ¶¶ 36-38).

[10] On March 2, 2017, after a remand from the investigating commissioner, the MCAD affirmed the finding of lack of probable cause.  (Cook Aff. Ex. 6).

switch #25.  (Collins Dep. at 15).  He then stopped the car.  (*Id.*).

If Collins had not stopped the car after crossing switch #25, it would have next crossed switch #21.  Instead, he stopped it just short of switch #21.  (*See* Collins Dep. at 15-16, 23; Pl. Ex. 7 (Cain Dep. Ex. 2)).

Collins changed ends in the car, because it could be operated from either end.  (*See* Collins Dep. at 15-17).  He got out of the car and threw switch #25 in the opposite direction, so he could head back over the switch onto a different track toward the car house.  (*Id.*).[11]

Collins then got back in and attempted to drive the disabled car toward the car house.  (*Id.* at 16-17).  However, the car would not move, as it had become completely immobile due to low air pressure.  (*Id.* at 17; Spencer Dep. at 117-20).

Collins apparently notified Spencer of the air pressure problem.  Spencer boarded a different car, drove it over to the rear of Collins's disabled car, and coupled it in order to provide air pressure to the disabled car.  (Collins Dep. at 19-20; Fong Aff. ¶ 11, Ex. 2; Spencer Dep. at 117-18).  The two cars appear to have been coupled together over switch #21—in other words, the wheels of the Collins car were on one side of the switch, and the wheels of the Spencer car were on the other.

After coupling the cars together, Spencer did not return to his car.  (Collins Dep. at 18-20; Fong Aff. ¶ 12, Ex. 2).  Instead, he got in the Collins car.  (*Id.*).  Spencer did not look at switch #21 or notice which way the switch was positioned before he got in the Collins car.  (Fong Aff. ¶¶ 11, 13, Ex. 2; Spencer Dep. at 122-23).

Unfortunately, switch #21 was set in the wrong direction.  When Collins began moving

---

[11] In his deposition, Collins did not explicitly mention switch #25 as the switch he threw.  Nonetheless, two diagrams in the record (including a schematic Collins drew during the deposition) clearly indicate which switch it was.  Furthermore, and as set forth below, if he had thrown switch #21, his testimony (and that of Spencer) becomes nonsensical.

his car toward the car house, the Spencer car, which was coupled to it but vacant, crossed switch #21. (Fong Aff. ¶¶ 13-14; Spencer Dep. at 122). The improper position of switch #21 caused the Spencer car to move on a different track than the Collins car, causing a "split switch" accident. (Collins Dep. at 23; Fong Aff. ¶¶ 9, 13; Spencer Dep. at 122). Both cars suffered substantial damage. (Fong Aff. ¶ 13; Spencer Dep. at 122).

The MBTA investigated the accident. (Fong Aff. ¶¶ 11-13, Ex. 2). It found that Spencer failed to check and throw switch #21 prior to the intended move, which caused his car to move on a different track than the Collins car. (*Id.* ¶ 13, Ex. 2). It further found that because Spencer was in the Collins car at the time his car moved over the switch, he had no opportunity to deploy the car's emergency braking system to prevent the accident or minimize the severity of the damage. (*Id.* ¶ 14, Ex. 2). With respect to Collins, however, it found that he was in control of his car at all relevant times; that he checked the switch (that is, switch #25) for the intended route of his car; that he never intended to traverse switch #21 with his car; and that it was Spencer's responsibility, not Collins's, to check switch #21 before Spencer's intended move of his car over that switch. (*Id.* ¶ 20, Ex. 2). It concluded that Spencer, but not Collins, violated several applicable MBTA safety rules, including Rule #1 ("Knowledge of Rules"), Rule #19(a) ("Attention to Duty"), and Rule #111(b), (c), (h), and (i) ("Streetcar Movements and Defensive Driving in Yard Area and Shop Areas"). (*Id.* ¶¶ 10, 15-20, Exs. 1-3).

Spencer received a three-day suspension following the accident. (*Id.* ¶¶ 10, 15, Ex. 1). Collins, however, was not disciplined. (*Id.* ¶ 20).[12]

On April 25, 2016, Spencer filed a third MCAD charge against the MBTA, in which he

---

[12] As part of the MBTA's investigation into the accident, both Spencer and Collins underwent drug and alcohol testing. Both tested negative. (Norris Aff. ¶ 9).

alleged that his three-day suspension for the split-switch accident was discriminatory and retaliatory. (Cook Aff. Ex. 8). He ultimately withdrew his 2016 MCAD charge so that he could file this complaint within the statute of limitations period. (Compl. ¶ 29).

### B. Procedural Background

Spencer filed this suit on July 3, 2017. The complaint asserts three counts. Counts 1 and 2 allege race discrimination and retaliation, respectively, in violation of Title VII. Count 3 alleges negligent infliction of emotional distress.[13]

The MBTA has moved for summary judgment as to all three claims.

## II. Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."

---

[13] The complaint refers to the NIED claim, which is the third and final count of the complaint as "Count IV" (Count 4). The Court assumes this is a typographical error, and will refer to the claim as "Count 3."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted).  The nonmoving

party may not simply "rest upon mere allegation or denials of his pleading," but instead must

"present affirmative evidence."  *Id.* at 256-57.

**III.**    <u>**Analysis**</u>

The complaint alleges discrimination, retaliation, and negligent infliction of emotional

distress.  The factual bases for those claims has been narrowed down to five disputed incidents in

which Spencer alleges that he was subjected to either discrimination, retaliation, or both.  He

alleges that (1) he was discriminated against on the basis of race in April 2011 when he was

deemed ineligible to apply for the substitute yardmaster position; (2) that he was wrongfully

denied overtime by Belanger on December 28, 2010; (3) that he was again wrongfully denied

overtime by Belanger on June 18, 2011; (4) that he was subjected to disparate discipline when he

was suspended on September 13, 2011, for speeding; and (5) that he was subjected to disparate

discipline when he was suspended again on January 15, 2016, following the split-switch

accident.

The MBTA has moved for summary judgment on all counts.  With respect to Counts 1

and 2, it contends Spencer is unable to make out a *prima facie* case of racially disparate

treatment or retaliation.  It further contends that it has articulated legitimate, non-discriminatory,

and non-retaliatory reasons for its actions, and that there is no evidence of pretext or

discriminatory or retaliatory animus.  With respect to Count 3, the MBTA contends that NIED is

a common-law personal-injury claim arising out of Spencer's employment, and is therefore

barred by the Massachusetts Worker's Compensation Act, Mass. Gen. Laws ch. 152, § 24.

A.     **Count 1:  Title VII Claim for Race Discrimination**

1.     **Legal Standard**

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee based on his or her "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Where, as here, there is no direct evidence of discriminatory animus and causation, a plaintiff may establish the necessary elements by circumstantial evidence using the three-stage burden-shifting method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  *See Rathbun v. Autozone, Inc.*, 361 F.3d 62, 71-72 (1st Cir. 2004). Under that framework, a plaintiff must first establish a *prima facie* case of discrimination. *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir. 2001).  Specifically, a plaintiff must show that

> (1) he or she is a member of a protected class; (2) possessed the necessary qualifications and adequately performed his or her job; (3) was nevertheless dismissed or otherwise suffered an adverse employment action at the hands of his or her employer; and (4) his or her employer sought someone of roughly equivalent qualifications to perform substantially the same work.

*Aly v. Mohegan Council, Boy Scouts of Am.*, 711 F.3d 34, 46 (1st Cir. 2013).

Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *Id.* However, "[t]his burden is not onerous."  *Williams v. Kennedy*, 38 F. Supp. 3d 186, 197 (D. Mass. 2014).  "The employer's reasons need not be wise, so long as they are not discriminatory and they are not pretext[ual]."  *Espinal v. National Grid NE Holdings 2, LLC*, 794 F. Supp. 2d 285, 292 (D. Mass. 2011), *aff'd*, 693 F.3d 31 (1st Cir. 2012) (quoting *Tardanico v. Aetna Life & Cas. Co.*, 41 Mass. App. Ct. 443, 448 (1996)).  If the employer articulates such a reason, the burden shifts back to the plaintiff to show that the proffered reason was mere pretext, and that the

true reason was unlawful discrimination. *Aly*, 711 F.3d at 46.

At the final stage of the *McDonnell Douglas* analysis, the plaintiff must show that the employer's proffered reason is "'a coverup' for a 'discriminatory decision.'" *Feliciano de la Cruz v. El Conquistador Resort and Country Club*, 218 F.3d 1, 6 (1st Cir. 2000) (quoting *McDonnell Douglas*, 411 U.S. at 805). In making that showing, a plaintiff must demonstrate both that the articulated reason is "a pretext and that the true reason is discriminatory." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000) (quoting *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 56 (1st Cir. 1999)). "Plaintiffs may use the same evidence to support both conclusions, provided that the evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action." *Thomas*, 183 F.3d at 57 (citation and quotation marks omitted). When considering evidence of pretext, "courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent." *See Santiago-Ramos*, 217 F.3d at 54.

There is no dispute that Spencer, as an African-American man, is a member of a protected class. There is also no dispute that he suffered adverse employment actions at the hands of the MBTA. The MBTA contends, however, that Spencer has not put forth any evidence that he has met the second prong of the *prima facie* case—that he possessed the necessary qualifications or adequately performed his job. It further contends that the comparator Spencer offers for one overtime-bypass incident is a member of the same protected class; that the comparators he offers for both disparate-discipline incidents were not similarly situated to him; and that therefore he cannot meet the fourth prong of the *prima facie* case as to those three incidents. Finally, it contends that Spencer suffered no adverse employment action in connection

with one of the alleged overtime-bypass incidents.

The Court will discuss each disputed incident in turn.

### 2. The Two Overtime-Bypass Incidents

The first incident is the December 28, 2010 overtime bypass of Spencer in favor of a white employee with less seniority. While Spencer has made out a *prima facie* case of discrimination, the MBTA has articulated a legitimate, non-discriminatory reason for its actions. It has offered evidence that the decision to bypass Spencer was a mistake—one that was immediately acknowledged in an e-mail from Fong, who then placed a note in Spencer's personnel file, and reinstructed the yard supervisor on the proper procedure.

Spencer has not put forth any evidence that the stated reason was mere pretext to cover up racial animus. It is true that "[p]retext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Goldstein v. Brigham & Women's Faulkner Hosp., Inc.*, 80 F. Supp. 3d 317, 326 (D. Mass. 2015) (quoting *Gómez-González v. Rural Opportunities, Inc.*, 626 F.3d 654, 662-63 (1st Cir. 2010)). However, a mere mistake, without more, is not sufficient to support a reasonable inference of pretext. *See Espinal*, 794 F. Supp. 2d at 292.

The fact that Spencer was not aware of Fong's remedial actions until this litigation does not change the analysis. On this point, he contends as follows:

> [A] reasonable fact finder might well ask why place such a note in a personnel file and never tell the plaintiff. Such actions make no business sense, does not solve the problem and cannot sooth[e] the plaintiff's feeling of being wronged because he was not even aware of the employer's actions. Such a meek rationale by the employer could readily convince a reasonable fact finder that the proffered reason for the adverse action was pretext and a cover for impermissible considerations of

race.

(Pl. Mem. in Opp. at 17).  But even assuming Spencer was not aware of the actions, that is not

sufficient to support a plausible inference of pretext.  *See Williams*, 38 F. Supp. 3d at 197

(finding no evidence of retaliatory motive in employer's "improper decision to [take adverse

employment action] . . . that was done outside of normal procedures and was then rescinded").

Indeed, he has not made out even a "slight suggestion of pretext," which itself would be

insufficient for the claim to survive summary judgment.  *See Kosereis v. Rhode Island*, 331 F.3d

207, 215-16 (1st Cir. 2003).

Moreover, Spencer has not offered any evidence of discriminatory animus.  His

subjective belief that he was discriminated against on the basis of race, without more, is not

enough.  *See Quinones v. Houser Buick*, 2005 WL 1668195, at *4 (D. Mass. July 14, 2005), *aff'd

sub nom. Quinones v. Buick*, 436 F.3d 284 (1st Cir. 2006) ("Plaintiff's subjective beliefs are of no

moment."); *see also Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001) (plaintiff's

subjective belief that she is being discriminated against "does not, without more, demonstrate

pretext"); *Diaz v. Crowley Liner Servs., Inc.*, 281 F. Supp. 2d 340, 349, 351 (D.P.R. 2003)

("Plaintiff's mere subjective belief and allegations that she was discriminated against cannot be

the basis for judicial relief where adequate nondiscriminatory reasons are presented.").

As to the June 18, 2011 overtime-bypass incident, even assuming that the denial of

additional overtime was an adverse employment action, Spencer still fails to make out a *prima

facie* case of discrimination.  The coworker who did receive the shift was an African-American,

and therefore a member of the same protected class.

Under the circumstances, there is not adequate evidence from which a rational jury could

reasonably infer that the denial of overtime on either occasion was motivated, even in part, by

race.

### 3. The Alleged Denial of Opportunity for Promotion

Spencer concedes that he was ineligible to apply for the substitute-coverage position in April 2011 due to his October 2010 suspension for violating the MBTA's attendance policy. (Pl. Mem. in Opp. at 9). In light of that concession, it is unclear whether he still alleges that he was discriminated against on the basis of race when he was deemed ineligible to apply for the substitute yardmaster position. In any event, because he cannot show that he possessed the necessary qualifications for the position, he has failed to make out a *prima facie* case of disparate treatment, and it is unnecessary to proceed to the second or third steps of the *McDonnell Douglas* analysis.

### 4. The Claim of Disparate Treatment Based on the Speeding Incident

As to Spencer's September 2010 suspension for speeding, the evidence, read charitably, indicates either (1) that he failed to perform his job properly in the first instance; or (2) that speeding was the legitimate, non-discriminatory reason for the suspension. And he has not put forth any evidence that the decisionmaker, O'Brien, acted out of racial animus, or that the speeding violation was mere pretext for such animus.

"Plaintiffs can show that an employer's stated reasons are pretextual in any number of ways." *Kosereis*, 331 F.3d at 214. "One method is to produce evidence that the plaintiff was treated differently than other similarly situated employees." *Id.* "To successfully allege disparate treatment, a plaintiff must show 'that others similarly situated to him in all relevant respects were treated differently by the employer.'" *Id.* (quoting *Conward v. Cambridge School Committee*, 171 F.3d 12, 20 (1st Cir. 1999). "The examples of disparate treatment 'need not be perfect replicas, [but] they must closely resemble one another in respect to relevant facts and

circumstances.'" *Id.* (quoting *Conward*, 171 F.3d at 20).

Here, Spencer's evidence of pretext is that he was treated differently than the other two employees who were found to be speeding in the same audit. However, those employees were speeding at five miles per hour (or less) over the speed limit, while Spencer was speeding at more than five miles per hour over the limit. Spencer received a suspension under the terms of the MBTA progressive-discipline policy, and they did not. Spencer, therefore, was not similarly situated to the comparators he has offered, and his claim for disparate treatment fails.[14]

### 5. The Claim of Disparate Treatment Based on the Split-Switch Accident

As noted earlier, the final basis for Spencer's disparate treatment claim stems from a split-switch incident in January 2016.

For purposes of this analysis, the Court will assume that Spencer has established a *prima facie* case of discrimination as to that incident. Moreover, the parties do not dispute that the MBTA has furnished a facially legitimate, non-discriminatory justification for disciplining Spencer. Therefore, the Court proceeds directly to the third stage of the *McDonnell Douglas* burden-shifting framework. At the third stage, a plaintiff must "demonstrate either that [his] dismissal was (i) 'more likely motivated' by discrimination than by the explanation proffered by [the employer], or (ii) the proffered 'explanation was unworthy of credence' in circumstances where the suspect denial, taken together with other facts, suggests such a motivation." *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 35 (1st Cir. 2001) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). Here, Spencer must show that the discipline he received was a pretext for discrimination.

---

[14] Moreover, one of those employees was a member of his same protected class.

In his opposition to the MBTA's motion for summary judgment, Spencer contends that he was subject to disparate treatment because Collins also drove his car across switch #21 without moving it to the proper position, but was not disciplined. However, Spencer was not in fact similarly situated to Collins, and has failed to show that there is a genuine disputed issue of material fact on the issue of disparate treatment.

To begin, Spencer conflates the evidence as to switches #25 and #21, and therefore presents a jumbled and incoherent narrative as to how the accident happened. It is true that in his deposition testimony, Collins would sometimes refer to "the switch" without stating directly which one he meant. *See, e.g.*, Collins Dep. at 17 ("[I] got out and threw the switch, got back on the train and it wouldn't move."). Nonetheless, it is clear in context which switch is at issue, and Spencer cannot create an issue of material fact by attempting to impose a distorted view of the evidence.

Spencer thus claims that the Collins car had crossed switch #21 before it became immobilized. He has offered no direct evidence of that fact; he himself admitted that he did not observe whether the Collins car had ever crossed switch #21. (Spencer Dep. at 120). Instead, that contention is based entirely on speculation and a misinterpretation of the record.[15]

Indeed, Spencer's version of events makes no logical sense. If, as Spencer contends, the Collins car crossed switch #21 before it became immobilized, then both the Spencer and the Collins cars would have been on the same side of switch #21 after they were coupled together. When they started to move, both cars would have followed the same track. The only way they

---

[15] Spencer also cites Collins's testimony that he drove his car past lines 4, 5, 6, and 7, which Spencer argues necessarily would have required him to pass over switch #21. (*See* Collins Dep. at 15-16). But a diagram Collins drew during his deposition clearly shows that he crossed switch #25 and halted his car before reaching switch #21. (Collins Dep. Ex. 1; *see also* Pl. Ex. 7 (Cain Dep. Ex. 2)). And Spencer has offered no contrary evidence (for example, a measurement of the distances involved) to cast doubt on Collins's version of events.

could have followed different tracks is if switch #21 had suddenly changed positions, without human intervention, in the instant between the time the Collins car crossed the switch and the time the Spencer car crossed it. That is unlikely, to say the least. Moreover, an investigation by the MBTA showed that switch #21 was functioning properly at the time of the accident. (Fong Aff. ¶ 13).[16] In short, the only way the accident could have occurred is if in fact the Collins car never crossed switch #21, and the two cars were on different sides of the switch when the Collins car started moving again.

Accordingly, Spencer and Collins were not similarly situated with respect to the accident. The improperly set switch was switch #21, not switch #25. Collins's car never crossed switch #21. Spencer's car, however, did (or at least began to). The MBTA concluded that Spencer violated the rules by failing to check switch #21 before his car crossed over it (and by leaving his car vacant). And it concluded that Collins, under the circumstances, was not required to check switch #21.

Of course, the MBTA could have disciplined Collins, as well as Spencer, for the accident. But the standard is not whether the MBTA's discipline was correct, or even fair; it is whether there is sufficient evidence to find that the disciplinary decision was a pretext for discrimination on the basis of race. That pretext cannot be reasonably inferred, in these circumstances, based on disparate treatment. Because Spencer has offered no evidence, other than his mischaracterization of the record, to generate an inference of pretext, summary judgment will be granted as to Count

---

[16] Spencer disputes the MBTA's representation that switch #21 was functioning properly the day of the accident. But he does not offer any contrary evidence, other than to point to a statement that a yardmaster had accidentally damaged another switch in the yard, requiring that all switches in that yard be inspected. (Pl. Resp. to SMF ¶ 98). Even if true, however, that does not change the fact that the MBTA confirmed that switch #21, the only one in question, was working properly. Spencer further contends that "if indeed Collins [had] checked the switch [#21] and set it in the correct direction . . . then it appears that there may have been something wrong with switch #21." (*Id.*). Again, however, Collins never testified that he checked or set switch #21.

1.  *See Rathbun*, 361 F.3d at 76; *see also Rivas Rosado v. Radio Shack, Inc.*, 312 F.3d 532, 534-35 (1st Cir. 2002) (affirming grant of summary judgment on disparate treatment claim where there was no reason to believe reason for termination was pretextual).

### B.  Count 2:  Title VII Claim for Retaliation

#### 1.  Legal Standard

Title VII makes it unlawful for any "employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under that statute.  *See* 42 U.S.C. § 2000e-3(a).  Such retaliation claims are also evaluated under the *McDonnell Douglas* burden-shifting framework.  *See, e.g.*, *Mariani-Colón v. Department of Homeland Sec.*, 511 F.3d 216, 223 (1st Cir. 2007).  In order to establish a *prima facie* case of retaliation, a plaintiff must establish three elements:  (1) that the plaintiff engaged in a protected activity; (2) that the plaintiff suffered a materially adverse action, causing him harm either inside or outside of the workplace; and (3) that the adverse action was causally linked to his protected activity.  *See id.* (citing *Dixon v. International Bhd. of Police Officers*, 504 F.3d 73, 81 & n.4 (1st Cir. 2007)).  If the plaintiff makes that showing, the burden of production shifts to the defendant to articulate a legitimate, nonretaliatory reason for its employment decision.  *See McDonough v. City of Quincy*, 452 F.3d 8, 17 (1st Cir. 2006).  If the defendant presents such a reason, the plaintiff must demonstrate that the defendant's proffered reason is pretext masking illegal retaliation.  *See id.*

Spencer alleges that some or all of the alleged incidents of overtime bypass and disparate discipline, in addition to being racially discriminatory, were also in retaliation for his protected activity.

### 2.    The Two Overtime-Bypass Incidents

Based on the evidence, Spencer has not made out a *prima facie* case of retaliation for either overtime-bypass incident. Undoubtedly, his 2006 MCAD charge, including the 2010 probable-cause finding, constitutes "protected activity" under § 2000e-3. So does his 2011 ODCR complaint. There is also some evidence that he suffered material adverse actions: he was bypassed for overtime on one occasion, and allegedly "knocked off the clock," or denied additional overtime, on a second occasion.

As to retaliatory intent, there is no affirmative evidence that Belanger, the alleged decisionmaker on both bypass occasions, was even aware of his 2006 MCAD charge, the 2010 probable-cause finding in that proceeding, or the 2011 ODCR complaint at the time of either incident. Again, Belanger testified that at the time of both incidents, he was not aware that Spencer had filed a complaint with the MCAD or ODCR, or even that he had ever complained of discrimination at the hands of Belanger to anyone at the MBTA. Spencer nonetheless contends that Belanger *should* have been aware of those complaints. In substance, he assumes that Belanger was interviewed about the incidents in accordance with MBTA policy. But even assuming that Belanger was interviewed, there is no evidence that any such interview revealed the existence of an earlier MCAD or ODCR complaint. For example, the first overtime bypass incident occurred on December 28, 2010. Spencer complained the same day, and the issue was apparently investigated and resolved immediately. Spencer did not, however, file an ODCR complaint until January 10, 2011. In short, Spencer has not established that either overtime bypass was causally linked to his protected activity, and therefore has failed to make out a *prima facie* case for retaliation.

In any event, even assuming the existence of sufficient evidence to shift the burden of

production to the MBTA, the evidence indicates that it had a legitimate, non-retaliatory reason for the first bypass—namely, that it was a mistake, one which Fong took immediate steps to acknowledge and rectify.  There is also no evidence of pretext or retaliatory animus as to either alleged bypass.  *See Williams*, 38 F. Supp. 3d at 197 (finding no evidence of retaliatory motive in employer's "improper decision to [take adverse employment action] . . . that was done outside of normal procedures and was then rescinded"); *see also Espinal*, 794 F. Supp. 2d at 292 ("The employer's reasons need not be wise, so long as they are not discriminatory and they are not pretext.") (quoting *Tardanico*, 41 Mass. App. Ct. at 448).

Under the circumstances, there is not adequate evidence from which a rational jury could reasonably infer that the denial of overtime on either occasion was motivated, even in part, by Spencer's protected activity.

### 3. The Two Claims of Disparate Discipline

It is not clear if Spencer still alleges that his suspensions were motivated by retaliatory animus.  Even if he does, however, those claims fail under *McDonnell Douglas*, because he cannot establish a causal connection between either suspension and his protected activity.  He has offered no evidence that the decisionmakers in his speeding and split-switch suspensions were even aware of his 2010 and 2011 protected activities at the time of suspension.  *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).  And the 2016 split-switch suspension is too remote in time for temporal proximity, by itself, to show a causal connection to protected activities that had occurred some five years earlier.  *See id.* at 273-74 ("Action taken . . . 20 months later suggests, by itself, no causality at all."); *Ahern v. Shinseki*, 629 F.3d 49, 57-58 (1st Cir. 2010) (period of "several months" between protected activity and adverse effect not close enough for temporal proximity to establish causal connection).  "It is insufficient for [Spencer] to

simply recount that he complained and that he was disciplined," if he has not offered any evidence connecting the discipline he received to his MCAD or ODCR complaints. *See Kosereis*, 331 F.3d at 217 (quoting *King v. Town of Hanover*, 116 F.3d 965, 968 (1st Cir. 1997)).

Furthermore, the MBTA has offered legitimate reasons for both suspensions—that is, Spencer's violation of safety rules. And he has offered no evidence that those reasons were pretextual, or a disguise for retaliatory animus.

Because there is not sufficient evidence from which a reasonable jury could conclude that any of the adverse employment actions Spencer suffered were motivated, even in part, by his protected activity, summary judgment will be granted as to Count 2.

### C. Count 3: NIED

With respect to Count 3, the MBTA contends that negligent infliction of emotional distress ("NIED") is a common-law personal-injury claim arising out of Spencer's employment, and is therefore barred by the Massachusetts Workers' Compensation Act ("MWCA"), Mass. Gen. Laws ch. 152, § 24.

The MWCA provides that "[a]n employee shall be held to have waived his right of action at common law or under the law of any other jurisdiction in respect to an injury that is compensable under this chapter, to recover damages for personal injuries, if he shall not have given his employer, at the time of his contract of hire, written notice that he claimed such right." Mass. Gen. Laws ch. 152, § 24. Compensable injuries include "personal injury arising out of and in the course of his employment." *Id.* § 26. "[E]motional distress arising out of employment [is] a personal injury under the [MWCA]." *Foley v. Polaroid Corp.*, 381 Mass. 545, 550 (1980).

Here, the MBTA correctly contends that Spencer's NIED claim is barred by the exclusivity provisions of the MWCA. *See id.* at 550-51 (dismissing a claim by an employee

against his employer for intentional infliction of emotional distress arising out of the employer's investigation into employee's alleged misconduct on the job); *Green v. Wyman-Gordon Co.*, 422 Mass. 551, 558-59, (1996) (holding that plaintiff's claims against her employer for intentional and negligent infliction of emotional distress due to sexual harassment at work were barred by MWCA).

Accordingly, summary judgment will be granted as to Count 3.

**IV.**    **Conclusion**

For the foregoing reasons, defendant MBTA's motion for summary judgment is GRANTED.

**So Ordered.**

/s/  F. Dennis Saylor
F. Dennis Saylor IV
Dated: June 5, 2019                                 United States District Judge